## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

BRIGITTA A. WUTHRICH,

      Plaintiff,

v.                             Case No:  2:17-cv-261-FtM-99CM

COMMISSIONER OF SOCIAL
SECURITY and SSA,

      Defendants.

_____

### REPORT AND RECOMMENDATION[1]

Plaintiff Brigitta A. Wuthrich seeks judicial review of the denial of her claims for disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") by the Commissioner of the Social Security Administration ("Commissioner").   The Court has reviewed the record, the Joint Memorandum (Doc. 23) and the applicable law.   For the reasons discussed herein, the Court recommends the decision of the Commissioner be affirmed.

---

[1] A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   *See* 11th Cir. R. 3-1.   In order to expedite a final disposition of this matter, if the parties have no objection to this Report and Recommendation, they promptly may file a joint notice of no objection.

## I.    Issues on Appeal[2]

Plaintiff raises seven issues on appeal:[3] (1) whether substantial evidence supports the ALJ's finding that Plaintiff's vision impairments are not severe; (2) whether the ALJ erred in failing to find Plaintiff's musculoskeletal impairments to be severe and to include relevant limitations in the residual functional capacity ("RFC") assessment; (3) whether substantial evidence supports the ALJ's finding that Plaintiff can perform work at all exertional levels; (4) whether the ALJ erred in finding Plaintiff could perform jobs that permit being off task five percent of the workday in addition to regularly scheduled breaks; (5) whether substantial evidence supports the ALJ according minimal weight to Plaintiff's global assessment function ("GAF") scores; (6) whether substantial evidence supports the ALJ's finding that the jobs identified by the vocational expert ("VE") comply with Plaintiff's RFC; and (7) whether substantial evidence supports the existence of a substantial number of jobs that Plaintiff can perform.

## II.    Summary of the ALJ's Decision

On November 9, 2011, Plaintiff protectively filed applications for DIB and SSI, alleging her disability began on January 2, 2009 due to bipolar depression.  Tr. 138, 147, 316-34.   Plaintiff's claims were denied initially on January 20, 2012, and upon

---

[2] Any issue not raised by Plaintiff on appeal is deemed to be waived.  *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) ("[A] legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.").

[3] For clarity and judicial efficiency, the Court will address the issues in a different order than the Joint Memorandum.

reconsideration on April 4, 2012.   Tr. 138-155, 158-175.   On May 21, 2012, Plaintiff requested a hearing before an ALJ.   Tr. 225-26.   ALJ Troy M. Patterson held a hearing on November 19, 2013, and on January 29, 2014, ALJ Patterson found Plaintiff was not disabled from January 2, 2009 through the date of the decision.   Tr. 114-37, 181-88.   On April 22, 2015, the Appeals Council granted Plaintiff's request for review and remanded the case.   Tr. 193-95.   ALJ Tammy H. Whitaker held a hearing on September 3, 2015, and on March 4, 2016, ALJ Whitaker[4] found Plaintiff was not disabled from January 2, 2009 through the date of the decision.   Tr. 15-29, 39-105.

At step one, the ALJ found Plaintiff last met the insured status requirements of the Social Security Act on September 30, 2012 and had not engaged in substantial gainful activity since the alleged onset date of January 2, 2009.   Tr. 17-18. Although Plaintiff worked as a self-employed housekeeper after the alleged onset date, the ALJ found Plaintiff's earnings did not represent substantial gainful activity. Tr. 18.   Next, at step two, the ALJ found Plaintiff had the following severe impairments: bipolar disorder; depressive disorder not otherwise specified; mood disorder not otherwise specified; history of post-traumatic stress disorder; anxiety disorder; borderline traits; borderline personality disorder; alcohol-induced mood disorder; alcohol abuse and dependence; sedative, hypnotic and anxiolytic dependence; poly-substance abuse and history poly-substance overdose; alcohol

---

[4] For the remainder of this Report and Recommendation, references to "the ALJ" are made in reference to ALJ Whitaker.

dependence; and history of cannabis dependence in remission.  *Id.*  At step three, the ALJ concluded Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  *Id.*  The ALJ determined Plaintiff had the RFC to perform work at all exertional levels, but with the following nonexertional limitations:

> [Plaintiff] can do no commercial driving; limited to simple, routine, and repetitive work; limited to work that allows the individual to be off task five percent of the work day in addition to regularly scheduled breaks; limited to work with no production rate or pace work; and limited to work with only occasional interaction with the public and co-workers.

Tr. 20-27.  At step four, the ALJ determined Plaintiff was unable to perform any past relevant work.  Tr. 27.  Finally, at step five, the ALJ determined there were a significant number of jobs in the national economy Plaintiff could perform.  Tr. 28-29.  Thus, the ALJ concluded Plaintiff was not disabled from January 2, 2009 to March 4, 2016, the date of the decision.  Tr. 29.  The Appeals Council denied Plaintiff's request for review on March 23, 2017, and Plaintiff subsequently filed a Complaint with this Court.  Tr. 1-4; Doc. 1.  The matter is now ripe for review.

## III.   Standard of Review

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards and whether the findings are supported by substantial evidence.  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).  The Commissioner's findings of fact are conclusive if supported by

substantial evidence.   42 U.S.C. § 405(g).[5]   Substantial evidence is "more than a scintilla, i.e., evidence that must do more than create a suspicion of the existence of the fact to be established, and such relevant evidence as a reasonable person would accept as adequate to support the conclusion." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (internal citations omitted).

"In determining whether substantial evidence supports a decision, we give great deference to the ALJ's factfindings." *Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 822 (11th Cir. 2015).   Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact or found that the preponderance of the evidence is against the Commissioner's decision.   *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *see also Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the factual findings).   The Court reviews the Commissioner's conclusions of law under a *de novo* standard of review.   *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007) (citing *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)).

---

[5] After the ALJ issued the decision, certain Social Security rulings and regulations were amended, such as the regulations concerning the evaluation of medical opinions and evaluation of mental impairments.   *See e.g.*, 20 C.F.R. §§ 404.1520a, 404.1520c, 404.1527 (effective March 27, 2017), 416.920a, 416.920c, 416.927 (effective March 27, 2017); SSR 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017).   The Court will apply rules and regulations in effect at the time of the ALJ's decision.   *Hargress v. Soc. Sec. Admin., Comm'r*, 883 F.3d 1302, 1308 (11th Cir. 2018); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); 20 C.F.R. §§ 404.1527, 416.927 (effective March 27, 2017) ("For claims filed . . . before March 27, 2017, the rules in this section apply.").

## IV.   Discussion

### a.  *Step two determination*

A medically determinable physical or mental impairment is one that "can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 1382c(a)(3)(A).    The Social Security Regulations explain what is needed for a claimant to show an impairment:

> [A claimant's] impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques.   A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms.

20 C.F.R. §§ 404.1508, 416.908.   The regulations clearly state that a claimant's statements alone "are not enough to establish that there is a physical or mental impairment."   20 C.F.R. §§ 404.1528, 416.928.   Medically acceptable laboratory diagnostic techniques to establish a medical determinable impairment include "chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests."   20 C.F.R. §§ 404.1528, 416.928.

At the second step in the sequential evaluation process, the ALJ determines whether the claimant has a severe impairment.   20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).   A severe impairment is an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to do basic work activities.   20 C.F.R. §§ 404.1520(c); 416.920(c).   "An impairment is not

severe only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986).   "[A] diagnosis or a mere showing of a 'deviation from purely medical standards of bodily perfection or normality' is insufficient; instead, the claimant must show the effect of the impairment on her ability to work." *Wind v. Barnhart*, 133 F. App'x 684, 690 (11th Cir. 2005) (quoting *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)).   Plaintiff bears the burden of establishing her impairments are severe and prevent the performance of her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

Plaintiff alleges the ALJ improperly failed to identify Plaintiff's vision and musculoskeletal impairments as severe, which led to the ALJ failing to include relevant limitations in the RFC and making a decision unsupported by substantial evidence.   Doc. 23 at 26-27, 35-36.   The Court recommends substantial evidence supports the ALJ's step two findings.

### i.  Vision Impairments

The ALJ found Plaintiff's visual impairments were not severe.   Tr. 23.   The ALJ reasoned:

> [T]he medical evidence shows that the claimant has been diagnosed with astigmatism, presbyopia, and early cataract; she has a history of conjunctival irritation; and she has been diagnosed with uveitis. Specifically, the record shows that the claimant underwent a visual evaluation with Dr. John B. Lewis in August 2015.   At that time, Dr. Lewis indicated that the claimant does not have a loss of visual acuity with remaining vision in the better eye after best correction of 20/200 or less; does not have a loss of visual efficiency, or visual impairment, in

the better eye with a visual efficiency percentage of 20 or less after best correction; and does not have a loss of visual efficiency, or visual impairment, in the better eye with a visual impairment value of 1.00 or greater after best correction. In fact, it appears the claimant has uncorrected visual acuity of 20/25 in the right eye and 20/30 in the left eye. These findings, coupled with the lack of consistent, ongoing treatment from an ophthalmologist or other eye specialist, are incompatible with severe visual impairments.

*Id.* (citations omitted). John Lewis, OD, is an optometrist who conducted a comprehensive eye exam for Plaintiff on August 19, 2015. Tr. 641-45. On the same day, Dr. Lewis also completed a visual evaluation form and two forms evaluating whether Plaintiff met a listing. Tr.633-39. The ALJ accorded mixed weight to Dr. Lewis' opinions. *See* Tr. 26. The ALJ gave significant weight to Dr. Lewis' opinion that Plaintiff does not meet or equal a listing because that finding was consistent with the medical evidence of record. *Id.* (citing Tr. 637, 639). The ALJ gave little weight, however, to Dr. Lewis' opinion on the vision evaluation form—which concluded Plaintiff's reading, driving and near vision are affected by a visual impairment—because Dr. Lewis did not "provide specific, quantifiable limitations (i.e. what the claimant can and cannot do)[,] and he did not indicate whether these 'restrictions' were based upon corrected or uncorrected visual acuity." Tr. 26 (citing Tr. 634).

Plaintiff argues the ALJ improperly afforded Dr. Lewis' opinion little weight based on its failure to specifically articulate what Plaintiff could and could not do, when it did in fact provide such limitations. Doc. 23 at 26. Plaintiff contends Dr. Lewis opined as to Plaintiff's limitations by indicating her reading and driving would be substantially reduced by the vision impairments but her ability to follow written

instructions, write or use computers would not be.   *Id.*   Plaintiff asserts that if the ALJ found Dr. Lewis' opinion ambiguous regarding the identified limitations, then the ALJ needed to contact Dr. Lewis for clarification.   *Id.*   Plaintiff notes that in determining her visual impairments were not severe, the ALJ did not address Dr. Lewis' opinion that Plaintiff's reading and driving would be substantially reduced by the visual impairments despite citing Dr. Lewis' findings regarding Plaintiff's visual acuity and efficiency.   *Id.* at 27.   Plaintiff argues her vision problems motivated the ALJ to prohibit commercial driving in the RFC, and thus the vision problems "clearly affected Plaintiff's ability to perform work functions and accordingly should have been found severe."   *Id.*

The Commissioner argues substantial evidence supports the ALJ's step two findings, including the ALJ's finding that Plaintiff did not have severe visual impairments.   *Id.* at 29.   The Commissioner contends the objective evidence from Dr. Lewis' evaluation as well as the lack of consistent, ongoing treatment from an eye specialist support the ALJ's finding that Plaintiff did not have a severe eye impairment.   *Id.* at 30.   The Commissioner asserts that because the evidence in the record was sufficient to allow the ALJ to make an informed decision, the ALJ had no duty to contact Dr. Lewis for clarification.   *Id.*   The Commissioner contends the ALJ correctly assigned little weight to Dr. Lewis' opinion that Plaintiff's visual impairments affect her reading and driving because Dr. Lewis did not provide specific limitations or indicate whether the effects were based on corrected or uncorrected visual acuity.   *Id.*   The Commissioner also argues Dr. Lewis was not entitled to

deference or special consideration because he only examined Plaintiff once.   *Id.* at 31.   The Court recommends the ALJ properly evaluated Plaintiff's visual impairments.

During Plaintiff's eye exam on August 19, 2015, Dr. Lewis noted Plaintiff experienced blur with near vision and slight blur with distant vision of mild to moderate severity.   Tr. 641.   As the ALJ noted, Dr. Lewis indicated Plaintiff had uncorrected visual acuity of 20/25 in the right eye and 20/30 in the left eye.[6]   *Id.*   Dr. Lewis diagnosed Plaintiff with nuclear sclerosis, presbyopia and astigmatism.   Tr. 642.   He recommended Plaintiff wear prescription glasses full time and watch her cataracts.   Tr. 643.   Dr. Lewis noted Plaintiff should return to the clinic in a year. *Id.*   On the same day, Dr. Lewis completed forms opining Plaintiff's visual impairments did not meet a listing because Plaintiff did not a have a visual efficiency percentage of 20 or less after best correction, a visual impairment value of 1.00 or greater after best correction, or a loss of visual acuity with remaining vision in the better eye after best correction of 20/200 or less.   Tr. 637, 639.   On the vision evaluation form Dr. Lewis completed, he indicated Plaintiff's abilities to read and drive—but not her abilities to follow written instructions, write, or use computers— would be "substantially reduced" by Plaintiff's vision impairments.   Tr. 634.

---

[6] As a frame of reference, a visual acuity of 20/20 is considered normal.   *Visual Acuity: What is 20/20 Vision?,* American Optometric Association, https://www.aoa.org/patients-and-public/eye-and-vision-problems/glossary-of-eye-and-vision-conditions/visual-acuity (last visited July 27, 2018).   It means "you can see clearly at 20 feet what should normally be seen at that distance."   *Id.*   A visual acuity of 20/30 indicates you must be as close as 20 feet to see what a person with normal vision can see at 30 feet.   *See id.*

Substantial evidence supports the ALJ's decision to afford little weight to Dr. Lewis' vision evaluation form and find that Plaintiff's vision impairments were not severe.   The ALJ carefully considered Dr. Lewis' vision evaluation form opinions and gave specific and reasonable reasons for discounting them.   *See* Tr. 26.   The ALJ found the opinions in the form did not provide specific, quantifiable limitations of what the claimant could or could not do, and it was unclear whether the opinions were based on Plaintiff's corrected or uncorrected visual acuity.   *Id.*; *see* Tr. 634. The conclusory nature of such forms is why form questionnaires and so-called "checklist" opinions, such as the vision evaluation form completed by Dr. Lewis, generally are disfavored.   *Hammersley v. Astrue*, No. 5:08-cv-245-Oc-10GRJ, 2009 WL 3053707, at *6 (M.D. Fla. Sept. 18, 2009) ("[C]ourts have found that check-off forms . . . have limited probative value because they are conclusory and provide little narrative or insight into the reasons behind the conclusions."); *Jones v. Comm'r of Soc. Sec.*, 478 F. App'x 610, 612 (11th Cir. 2012) (holding that the boxes checked by the doctors did not constitute their actual RFC assessment because checking boxes did not indicate the degree and extent of the claimant's limitations).

More importantly, Dr. Lewis' opinion that Plaintiff's abilities to read and drive would be substantially reduced by her visual impairments is inconsistent with the record.   *See* Tr. 634.   First, as pointed out by the ALJ, the opinions in the vision evaluation form were inconsistent with Dr. Lewis' own treatment notes.   Dr. Lewis' exam records indicate Plaintiff has uncorrected visual acuity of 20/25 in the right eye and 20/30 in the left, and they do not suggest any additional or ongoing treatment

would be required; on the contrary, they show Plaintiff has mild to moderate blurred vision that is evidently correctable with prescription glasses, and she need not return to the optometrist for a year.    Tr. 641, 643.    Second, Plaintiff's testimony contradicted Dr. Lewis' opinions in the vision evaluation form.    The ALJ directly asked Plaintiff whether she has any trouble reading when she uses the reader glasses she was wearing at the hearing, and Plaintiff said, "No, I can read with the reader glasses."   Tr. 63.   When the ALJ asked if Plaintiff has difficulty with her vision other than at night when driving,[7] Plaintiff responded, "No, I kind of pick out what the road signs say until I can get right up on them."   Tr. 63.

Finally, Dr. Lewis' opinion that Plaintiff's ability to read would be substantially reduced by her vision impairments is negated by his opinion that her abilities to write or follow written instructions would not likewise be affected.   *See* Tr. 634.   In other words, it is unclear how one would have substantial difficulty with reading but not with following written instructions, which inevitably requires reading.   Therefore, the ALJ properly found the objective findings from Dr. Lewis' examination, as well as "the lack of consistent, ongoing treatment from an ophthalmologist or other eye specialist," were "incompatible with severe visual

---

[7] Plaintiff also argues the exclusion of commercial driving from Plaintiff's RFC supports a conclusion that Plaintiff's visual impairments are severe.   *See* Doc. 23 at 27. This argument is without merit.   It is unclear why the ALJ included a prohibition on commercial driving in Plaintiff's RFC.   But to the extent the ALJ included the limitation based on Plaintiff's eye impairments, it would suggest the ALJ properly considered "all allegations of physical and mental limitations or restrictions," not just those determined to be severe, as required by the law.   *See* SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996); *see* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); *Gibson v. Heckler*, 779 F.2d 619, 622-23 (11th Cir. 1986).

impairments." Tr. 23. Accordingly, the Court recommends substantial evidence supports the ALJ's finding that Plaintiff's visual impairments were not severe.

ii.   Musculoskeletal Impairments

The ALJ evaluated Plaintiff's complaints of Reiter's syndrome[8] but found it was not a medically determinable impairment. Tr. 24. The ALJ reasoned that a nurse practitioner had diagnosed Plaintiff with degenerative joint disease after being told an ER doctor had diagnosed Plaintiff with Reiter's syndrome, but nurse practitioners are not acceptable medical sources to diagnose impairments. *Id.*

The ALJ also found the record as a whole was inconsistent with a finding that Plaintiff's musculoskeletal impairments are severe. The ALJ noted the record contains diagnoses of arthritis from 2011, 2014 and 2015; tomography findings that "mild degenerative changes affect the spine;" and a history of right wrist surgery. Tr. 23 (citing Tr. 509, 624, 631, 647, 666); *see also* Tr. 511, 513, 515, 517, 549-50, 599, 601, 605, 615-17, 644, 647, 678. The ALJ found, however, "the record does not document consistent, ongoing complaints of symptoms related to these allegations," and the record does not document "consistent, ongoing treatment related to these complaints." Tr. 23. The ALJ identified particular records contradicting a conclusion that Plaintiff has severe musculoskeletal impairments:

> [R]ecords from August 2014 indicate that the claimant denied back pain, gout, joint swelling, muscle pain, muscle stiffness, and neck pain and

---

[8] Reiter's syndrome, also known as Reiter's disease or reactive arthritis, is a "pain or swelling in a joint that is caused by an infection in [the] body." *Reactive Arthritis*, National Institute of Arthritis and Musculoskeletal and Skin Diseases, https://www.niams.nih.gov/health-topics/reactive-arthritis (last visited July 24, 2018); *Reactive Arthritis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/reactive-arthritis/symptoms-causes/syc-20354838 (last visited July 24, 2018).

examination at that time showed that the claimant's back had normal inspection with no CVA tenderness, and no vertebral tenderness; her extremities were non-tender with normal range of motion, and normal inspection; her neck was non-tender with normal inspection and full range of motion; and there were no motor or sensory deficits. Additionally, records from February 2015 show that the claimant was in no acute distress; she was self-employed as a housekeeper; and that she enjoys bike riding.   Moreover, the record is devoid of consistent, ongoing clinical findings (such as extremity spasticity, unilaterally decreased reflexes, muscle atrophy, clonus, ataxia, etc.) of any pathology often associated with severe musculoskeletal conditions.   Additionally, records from June 2011 indicate that the claimant "rides her bike everywhere" and that she bikes four to five miles per day and records from August 2015 indicate that the claimant exercises five times per week and works.

*Id.* (citations omitted) (citing Tr. 508, 547, 599, 644); *see also* Tr. 500, 529, 542, 605, 613, 618, 629.

Plaintiff argues the ALJ's finding that her Reiter's syndrome was not a medially determinable impairment was unsupported by substantial evidence because the ALJ incorrectly indicated that only a nurse practitioner had diagnosed Plaintiff with Reiter's syndrome, but a doctor had also diagnosed her with it.   Doc. 23 at 35. Plaintiff asserts that because the ALJ did not recognize Reiter's syndrome as a medically determinable impairment, she failed to assess its severity at step two.   *Id.* Plaintiff further argues that because the ALJ did not find her musculoskeletal impairments to be severe, the ALJ failed to reflect the effects of the impairments in the RFC determination.   *Id.* at 36.

The Commissioner responds substantial evidence supports the ALJ's finding that Plaintiff did not have severe musculoskeletal impairments.   *Id.* at 37.   The Commissioner points out the various records the ALJ identified that are incompatible

with severe musculoskeletal impairments, including reports that Plaintiff rides her bike four-to-five miles daily, works out five days per week, works as a housekeeper, has denied back pain, gout, joint swelling, muscle pain, muscle stiffness and neck pain, and has undergone an examination indicating her back, neck and extremities were non-tender with full range of motion.   *Id.* (citing Tr. 18, 23).   The Commissioner also argues the record is "devoid of consistent, ongoing clinical findings . . . of any pathology often associated with severe musculoskeletal conditions."   *Id.* (quoting Tr. 23).   Thus, the Commissioner asserts substantial evidence supports the ALJ's findings at step two, and because the ALJ identified other severe impairments, any error at step two was harmless.   *Id.*   The Court recommends substantial evidence supports the ALJ's findings that Plaintiff did not have a medically determinable impairment of Reiter's syndrome, and her musculoskeletal impairments are not severe.

An Emergency Room ("ER") treatment note from August 7, 2014 indicates Plaintiff went to the ER complaining of joint pain, and Dr. Steven Mishkind discussed "the possible etiology of her symptoms," including reactive arthritis.   Tr. 545, 549, 611, 615, 627, 631.   In a treatment note from the Community Care Family Clinic on August 19, 2014, Carolyn Camacho, LPN listed in the "Nursing Notes" that Plaintiff "stated the ER told [her] she has Reiters Syndrome."   Tr. 607.   The same treatment note, which identifies Physician Assistant ("PA") Kenan Cetin as the provider and includes signatures from Mr. Cetin and Mahendrakumar Patel, M.D., identified Reiter's syndrome as a primary complaint in the "History of Present Illness," listed

"large joint arthritis (Reiter's Syndrome)" under "Musculoskeletal" in the "Review of Systems," and identified Reiter's syndrome as a newly assessed problem by Mr. Cetin. Tr. 605-10.   In another treatment note from the Community Care Family Clinic on March 12, 2015, Mr. Cetin listed "large joint arthritis (Reiter's Syndrome)" under "Musculoskeletal."   Tr. 598-99.   A summary of Plaintiff's chart from Community Care Family Clinic on August 10, 2015 identifies Plaintiff's responsible provider as Dr. Patel and lists Reiter's syndrome as one of Plaintiff's problems.   Tr. 596.

The Court recommends substantial evidence supports the ALJ's finding that Reiter's syndrome was not a medically determinable impairment.   Although the August 19, 2014 treatment note from the Community Care Family Clinic diagnosing Plaintiff with Reiter's Syndrome is signed by Dr. Patel, it clearly indicates Mr. Cetin was the "Provider" at the visit and assessed Reiter's syndrome as a new problem.   Tr. 605, 608 ("Assessed REITERS DISEASE as new – Kenan Cetin, PA-C").   Contrary to Plaintiff's suggestion, the fact that a doctor signed the treatment record does not necessarily indicate the doctor independently diagnosed Plaintiff.   Doc. 23 at 35; *see* Tr. 608, 610.   Additionally, the chart summary does not demonstrate that Dr. Patel diagnosed Plaintiff with Reiter's syndrome; it merely identifies Dr. Patel as Plaintiff's responsible provider and lists Reiter's syndrome—presumably based on the diagnosis by Mr. Cetin—as one of Plaintiff's problems.   Tr. 596.   The question for the Court is whether substantial evidence supports the ALJ's findings, not whether the record could support a different one, and here, substantial evidence supports the ALJ's finding that a doctor did not diagnose Plaintiff with Reiter's syndrome.   *See Parks v.*

*Comm'r, Soc. Sec. Admin.*, 783 F. 3d 847, 850 (11th Cir. 2015); *see also Edwards*, 937 F.2d at 584 n.3; *Barnes*, 932 F.2d at 1358.

Despite the ALJ mischaracterizing the diagnosing individual as a nurse practitioner in discounting the diagnosis, the Court recommends the ALJ properly discounted the Reiter's syndrome diagnosis because, like the opinion of a nurse practitioner, "the opinion of a [PA] is not an 'acceptable medical source' under the Social Security Regulations which can be used to establish the existence of an impairment." *Butcher v. Astrue*, No. 5:07-cv-351-Oc-10GRJ, 2008 WL 4724586, at *10 (M.D. Fla. Oct. 20, 2008) (citing 20 C.F.R. § 404.1513(a)). Even if the ALJ erred in failing to identify Reiter's syndrome as a medically determinable impairment, however, the Court recommends any such error was harmless because substantial evidence supports the ALJ's determination that Plaintiff's musculoskeletal impairments were not severe.

The medical records reference several musculoskeletal impairments, including arthritis, back pain and hand/wrist surgery. On August 16, 2009, a medical student noted in an admission history and physical record for Vanderbilt University Medical Center that Plaintiff had a history of arthritis. Tr. 678. Pharmacologic management progress notes from visits in July and November 2010 as well as February, April and June 2011 with Gregory E. Young, M.D. at Lee Mental Health Center list arthritis as an Axis III diagnosis. Tr. 509, 511, 513, 515, 517. A treating note from an emergency room visit at Desoto Memorial Hospital with Dr. Mishkind on August 7, 2014 describes Plaintiff's present illness as moderate pain in her joints

and lists arthritis as a medical problem and clinical impression.   Tr. 545, 549-50, 615-16, 631-32.   Treatment notes from the Community Care Family Clinic identify arthritis in Plaintiff's past medical history and as an issue causing pain in July and August 2014 as well as March 2015.   Tr. 599, 601, 605, 617.   Mostly illegible progress notes from a visit at Community Care Counseling Services on August 20, 2015 reference Plaintiff's arthritis.   Tr. 666.   Several medical records also indicate Plaintiff had a history of back pain and identified back pain as an issue on a few occasions, and a diagnostic imaging report from July 8, 2014 notes "[m]ild degenerative changes affect the spine."   Tr. 624, 669, 678, 716.   There are also several references to a history of hand/wrist surgery.   Tr. 599, 605, 617, 644, 647.

Diagnoses of medical conditions alone, however, are not sufficient to entitle Plaintiff to Social Security benefits; Plaintiff had the burden to establish that her musculoskeletal impairments—whether severe or not—affected her ability to perform basic work tasks.   *See Wind*, 133 F. App'x at 690; *McDaniel*, 800 F.2d at 1031.   Substantial evidence in the record, however, appears to demonstrate the opposite.   Various treatment notes indicate Plaintiff denied experiencing back pain, joint swelling, muscle pain, muscle stiffness and neck pain.   Tr. 547, 613, 629.   Such notes also demonstrate that physical examinations of Plaintiff's back and extremities have yielded normal results with no tenderness, normal range of motion and no motor or sensory deficits.    Tr. 547, 613, 629.   Records from 2011, 2014 and 2015 indicate Plaintiff works as a self-employed housekeeper, rides her bike everywhere—totaling four-to-five miles daily—and exercises five times per week.   Tr. 500, 529, 542, 599,

605, 618, 644.   Plaintiff testified her arthritis medicine makes her pain tolerable. Tr. 65, 67.   Further, as the ALJ noted, "the record is devoid of consistent, ongoing clinical findings . . . of any pathology often associated with severe musculoskeletal conditions."   Tr. 23.   Therefore, the Court recommends substantial evidence supports the ALJ's determination that Plaintiff's musculoskeletal issues and impairments were not severe.

iii.   Harmless Error

Even assuming the ALJ erred by not identifying Plaintiff's visual and musculoskeletal issues/impairments as severe, the Court recommends any such errors were harmless.   As the Eleventh Circuit has held, "[n]othing requires that the ALJ must identify, at step two, all of the impairments that should be considered severe."   *Heatly v. Comm'r of Soc. Sec.*, 382 F. App'x 823, 825 (11th Cir. 2010).   This is because after proceeding beyond step two of the process, the ALJ must consider all of the claimant's impairments taken as a whole when determining whether her impairments qualify as a disability (step three) and whether she can return to her past work (step four) or, if not, whether she can perform other work available in the national economy (step five).   *Id.*; *see* 20 C.F.R. §§ 404.1520, 416.920.   Accordingly, if the ALJ finds *any* severe impairment and proceeds beyond step two, an "error in failing to find that [the claimant] suffers from [] additional severe impairments . . . would be rendered harmless."   *Packer v. Comm'r, Soc. Sec. Admin.*, 542 F. App'x 890, 892 (11th Cir. 2013).

Here, the ALJ found that through the date last insured, Plaintiff had thirteen

severe impairments and proceeded beyond step two.   Tr. 18.   Thus, even if the ALJ erred by failing to identify Plaintiff's visual impairments, Reiter's syndrome and other musculoskeletal impairments as severe, those errors were harmless because the ALJ found Plaintiff has other severe impairments, and "that finding is all that step two requires."   *Packer*, 542 F. App'x at 892; *see Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987) ("[T]he finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two.").   Thus, the Court recommends that substantial evidence supports the ALJ's severity findings, and even if the ALJ erred, the error was harmless.

### b.  RFC determination

When the ALJ finds that an impairment does not meet or equal a listed impairment at step three, the ALJ will proceed to step four to assess and make a finding regarding the claimant's RFC based on all the relevant medical and other evidence in the record of a claimant's ability to do work despite her limitations.   Tr. 15-16; 20 C.F.R. §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a); *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1520(f)).   For these purposes, relevant evidence in the record includes any medical history, daily activities, lay evidence and medical source statements.   20 C.F.R. §§ 404.1545(a), 416.945(a).   The claimant's age, education and work experience, and whether she can return to her past relevant

work also are considered in determining her RFC.   *Lewis*, 125 F.3d at 1440 (citing 20 C.F.R. § 404.1545(a)).   The ALJ "must consider all allegations of physical and mental limitations or restrictions," not just those determined to be severe.   SSR 96-8p, 1996 WL 374184, at *5; *see* 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); *Gibson*, 779 F.2d at 622-23.   The ALJ is required to consider the combined effects of a claimant's alleged impairments and make specific, well-articulated findings as to the effect of the impairments and whether they result in disability.   *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir. 1987) (citing *Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984)).

Here, the ALJ found Plaintiff has the RFC to perform a full range of work at all exertional levels, with the following nonexertional limitations:

> [Plaintiff] can do no commercial driving; limited to simple, routine, and repetitive work; limited to work that allows the individual to be off task five percent of the work day in addition to regularly scheduled breaks; limited to work with no production rate or pace work; and limited to work with only occasional interaction with the public and co-workers.

Tr. 20.   Plaintiff challenges the ALJ's RFC determination regarding her ability to perform work at all exertional levels and her ability to perform jobs that permit being off task only five percent of the work day in addition to regularly scheduled breaks. Doc. 23 at 15-17, 32-33.   The Court recommends substantial evidence supports the ALJ's RFC determination.

### i.  Performing work at all exertional levels

Plaintiff argues the ALJ's finding that Plaintiff could perform work at all exertional levels is inconsistent with Plaintiff's assessments of arthritis, Reiter's

syndrome, mitral valve collapse, cardiac arrhythmia, chronic pain, degenerative joint disease, history of low back pain, history of seizures and arm/wrist surgery.   Doc. 23 at 15.   Plaintiff cites her hearing testimony regarding her physical limitations to support her contention that her physical impairments preclude her from performing medium or heavy work.   *Id.* at 15-17.   Plaintiff argues if she was properly limited to light or sedentary work, she would qualify as disabled as of January 3, 2014 under Medical-Vocational Rule 202.06 for light work, as of January 3, 2009 under Medical-Vocational Rule 201.14 for sedentary work, or earlier under the Hearings, Appeals and Litigation Law Manual ("HALLEX") I-2-2-42.   *Id.*

The Commissioner responds the ALJ properly found Plaintiff could perform the full range of work at all exertional levels when determining Plaintiff's RFC.   *Id.* at 18.   The Commissioner argues that although Plaintiff's medical records indicate diagnoses of the conditions identified by Plaintiff, a "mere diagnosis of a condition does not establish that Plaintiff has additional work-related limitations."   *Id.* (citing *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005)).   The Commissioner asserts the ALJ provided examples of medical records supporting his conclusion that Plaintiff could perform work at all exertional levels, including records indicating she rides her bike four-to-five miles daily; she exercises five days per week; she has denied back pain, joint swelling, muscle pain, muscle stiffness and neck pain; her extremities and neck are non-tender with normal range of motion; she has no motor or sensory deficits; and she has not had "consistent, ongoing clinical findings (such as extremity spasticity, unilaterally decreased reflexes, muscle atrophy, clonus, ataxia, etc.) of any

pathology often associated with severe musculoskeletal conditions." *Id.* at 19 (quoting Tr. 23).   The Commissioner contends that because substantial evidence supports the ALJ's finding that Plaintiff can perform work at all exertional levels, her argument that she is disabled under Medical Vocational Guideline 202.06 or 201.14 is without merit.   *Id.* at 20.   The Court recommends substantial evidence supports the ALJ's determination that Plaintiff could perform work at all exertional levels.

The record contains references to and diagnoses of arthritis from 2011, 2014 and 2015, as well as a history of right wrist surgery.   Tr. 509, 511, 513, 515, 517, 549-50, 599, 601, 605, 615-17, 631-32, 644, 647, 666, 678.   Several medical records indicate Plaintiff experienced and had a history of back pain, and a diagnostic imaging report from July 8, 2014 notes "[m]ild degenerative changes affect the spine." Tr. 624, 669, 678, 716.   Additionally, after Dr. Mishkind informed Plaintiff during an ER visit that a possible cause of her symptoms could be Reiter's syndrome, Mr. Cetin diagnosed Plaintiff with Reiter's syndrome.   Tr. 545, 549, 605-11, 615.   The record also contains passing references to chronic pain, diagnoses of mitral valve collapse and cardiac arrhythmia, and a history of seizures.   Tr. 509, 511, 513, 515, 517, 519, 521, 523, 655, 658-59, 683, 695, 701.

As the Commissioner correctly notes, however, diagnoses alone are insufficient to establish that Plaintiff's alleged impairments interfere with her ability to work, and the record supports that the alleged impairments do not impose physical limitations on Plaintiff.   *See* Doc. 23 at 18; *Wind*, 133 F. App'x at 690; *McDaniel*, 800

F.2d at 1031.   As discussed above in reference to the severity of Plaintiff's musculoskeletal impairments, the record indicates that: Plaintiff has denied experiencing back pain, joint swelling, muscle pain, muscle stiffness and neck pain; physical examinations of Plaintiff have yielded normal results; Plaintiff works as a self-employed housekeeper; Plaintiff rides her bicycle four-to-five miles daily and exercises five days per week; and her arthritis medicine makes her pain tolerable. Tr. 65, 67 500, 529, 542, 547, 599, 605, 613, 618, 629, 644.   Further, the references to chronic pain only are noted in Plaintiff's hospital records from her August 2009 suicide attempt, and Plaintiff denied experiencing chronic pain on several dates in 2014 and 2015.   *See* Tr. 683, 695, 701; *see also* Tr. 606,619, 643.   The references to diagnoses of mitral valve collapse and cardiac arrhythmia are noted only on pharmacological management progress notes from Lee Mental Health Center, and those progress notes do not reference any diagnostic or clinical assessments of Plaintiff's heart or resulting limitations.   Tr. 509, 511, 513, 515, 517, 519, 521, 523. The notes regarding seizures appear to be about a seizure Plaintiff experienced during her December 2009 suicide attempt, which involved an overdose, and there are no other seizures referenced before or after that seizure.   Tr. 655, 657-59.   In fact, during her hospitalization for her August 2009 suicide attempt, Plaintiff denied a history of seizures.   Tr. 648, 650, 690.

Although Plaintiff relies on her hearing testimony to support her argument that her physical limitations prevent her from performing work at all exertional levels, the ALJ properly weighed Plaintiff's subjective comments against the record

to determine the intensity and persistence of Plaintiff's alleged symptoms and their effect on the claimant's ability to work.   Doc. 23 at 15-17, Tr. 22-26; *see* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); *Wilson v. Barnhart*, 284 F.3d 1219, 1225-266 (11th Cir. 2002).   In doing so, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."   Tr. 25.   The ALJ explained that Plaintiff's daily activities, including her ability to prepare her own meals, take care of her cat, do "acceptable housekeeping," walk and ride a bicycle, shop in stores and continue to work after the alleged onset date, in addition to the lack of consistent, ongoing complaints of symptoms or consistent treatment related to Plaintiff's alleged physical impairments supported the determination that Plaintiff is "not entirely credible."[9] *See* Tr. 25-26; *see also* Tr. 22-24.   Further, the question for the Court is whether substantial evidence supports the ALJ's findings, not whether the record could support a different one.   *Parks*, 783 F. 3d at 850; *see also Edwards*, 937 F.2d at 584 n.3; *Barnes*, 932 F.2d at 1358.   Given the ALJ's thorough, well-articulated findings and the Court's review of the record, the Court recommends substantial evidence supports the ALJ's determination that Plaintiff could perform work at all exertional levels.

---

[9] As Plaintiff did not challenge the ALJ's credibility determination, that issue is deemed as waived.   *Access Now, Inc.*, 385 F.3d at 1330.

ii.  Ability to be off task five percent of the day

Plaintiff asserts the ALJ's RFC determination limiting Plaintiff to jobs permitting her to be off task five percent of the workday amounts to eight hours, or one work day, per four-week month, but Plaintiff's hospitalizations and doctors' appointments amounted to more than one day per month in February 2008, August 2009, December 2009, January 2011, February 2011, August 2014 and August 2015. Doc. 23 at 32.   Plaintiff cites her testimony about her concentration problems and how they would interfere with her ability to work to argue she could not perform a job that permits her to be off task for only five percent of the workday.   *Id.*   Thus, Plaintiff argues excessive hospitalizations and doctors' appointments as well as her off-task behavior due to concentration problems and multi-day reactions to triggers would prevent her from performing a job permitting no more than five percent off task behavior.   *Id.* at 33.

The Commissioner responds substantial evidence supports the ALJ's RFC finding, including that Plaintiff is limited to working jobs that permit individuals to be off task five percent of the workday in addition to regularly scheduled breaks.   *Id.* The Commissioner argues that Plaintiff's contention that her doctor appointments and hospital visits over the course of a seven-year period should be dispositive of the percentage of time she could be off task lacks merit.   *Id.* at 34.   The Commissioner asserts the ALJ properly considered the objective medical evidence and other evidence in the record to determine Plaintiff would not need to be off task more than five percent of the work day in addition to regularly scheduled breaks.   *Id.*

Although Plaintiff testified she has problems with focusing and concentrating beyond four or five hours a few days per week, the record does not indicate limitations beyond those recognized by the ALJ.   Tr. 69.   Mental status exams associated with Plaintiff's August 2009 hospitalization show assessments of Plaintiff's memory and concentration ranged from "intact" to "fair," "poor" and "impaired."   Tr. 673, 683, 693, 700.   In a discharge summary from that hospitalization, however, Plaintiff denied trouble with concentration, and no medical records outside of the August 2009 hospitalization note any complaints or assessments regarding Plaintiff's concentration problems.   Tr. 647.   Indeed, a patient health questionnaire completed during an office visit at the Community Care Family Clinic on March 12, 2015 indicated Plaintiff has no "[t]rouble concentrating on things such as reading the newspaper or watching the television."   Tr. 598.   Nevertheless, the ALJ gave great weight to the state agency consultants, who opined Plaintiff "likely has moderate limitations in her ability to maintain attention and concentration for extended periods" and that she could "sustain work activities without being overly distracted by coworkers or requiring special supervision."   Tr. 26; *see* Tr. 141, 143-44, 150, 152-53, 161, 163-65, 170, 172-74.   Accordingly, in assessing the severity of Plaintiff's mental impairments, the ALJ found Plaintiff has moderate difficulties with regard to concentration, persistence or pace.   Tr. 19.   The ALJ implemented this finding into Plaintiff's RFC, determining Plaintiff would be limited to work that would allow her to be off task five percent of the work day in addition to regularly scheduled breaks. Tr. 20.

As the Commissioner correctly notes, Plaintiff's sporadic doctor's appointments and hospitalizations over the course of the relevant disability period are not dispositive in determining her RFC.   *See* Doc. 23 at 34.   As discussed above, the ALJ considered the objective medical evidence, Plaintiff's treatment history, Plaintiff's activities of daily living and the overall record in determining Plaintiff's RFC, which are appropriate considerations.   20 C.F.R. §§ 404.1545(a), 416.945(a).   Further, the ALJ properly discounted the credibility of Plaintiff's testimony—including her testimony that she has problems concentrating—based on the evidence of record. *See* Tr. 25.   For example, the ALJ stated Plaintiff's completion of her disability paperwork shows she can persist on tasks.   *Id.*   The ALJ also noted the Social Security field office perceived no difficulties regarding Plaintiff's concentration during her telephonic interview.   *Id.*   The ALJ further cited reports of claimant's daily activities and the lack of consistent, ongoing treatment, which "clearly indicate that the claimant is capable of performing more than she claims and is not limited to the extent claimed."   *Id.*   Upon review of the record and the ALJ's findings, the Court recommends substantial evidence supports the ALJ's RFC determination.

### c.   *GAF Scores*

GAF is a numeric scale (0 through 100) mental clinicians use to subjectively rate an individual's social, occupational and psychological functioning at a particular moment in time. *See* American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 32-33 (4th ed. 1994) ("DSM IV").   In assessing Plaintiff's RFC, the ALJ considered and analyzed Plaintiff's GAF various scores:

> The undersigned has also considered and has given minimal weight to
> the various [GAF] scores (e.g. – 50 and 45).   [T]he regulations at 20 CFR
> [§§] 404.1527 and 416.927 provide that a medical source's opinion will
> be given evidentiary weight commensurate with the degree to which it
> is supported by relevant evidence and the degree to which it is consistent
> with the record as a whole.   In assigning no weight to these scores, the
> undersigned notes that these scores do not provide a function-by-
> function analysis of the claimant's abilities.   Additionally, these scores
> are not consistent with the record as a whole.   Specifically, these scores
> are grossly inconsistent with the overall objective medical evidence of
> record and are inconsistent with the lack of consistent, ongoing
> treatment from a mental health professional.

Tr. 26 (citations omitted).   Plaintiff challenges the ALJ's decision to discount

Plaintiff's GAF scores, arguing that it "led to a decision unsupported by substantial

evidence."   Doc. 23 at 38-41.   Plaintiff argues the multiple GAF scores throughout

the record are consistent with the objective medical evidence and the record as a

whole.   Doc. 23 at 39.   Plaintiff asserts she did not seek consistent treatment from

mental health professionals because, as she testified, she could not afford it and had

no health insurance.   *Id.*   Plaintiff notes most of the GAF scores came from a 28-

month period when Plaintiff did have ongoing mental health treatment, indicating

the scores reflect her ability to function while receiving treatment.   *Id.*   Plaintiff

asserts 17 of the 21 GAF scores were 50 or less, "indicating at least serious symptoms

or any serious impairment in social, occupational, or school functioning," according to

the DSM IV.   *Id.* at 40.   Thus, Plaintiff contends the ALJ's statements that GAF

scores are inconsistent with the record and objective medical evidence, as well as the

ALJ's reliance on a lack of consistent mental health treatment in the face of Plaintiff's

inability to pay for such treatment, are unsupported by substantial evidence.   *Id.* at

40-41.

The Commissioner argues the ALJ properly evaluated the various GAF scores in the record, noting two as examples and properly giving them minimal weight. *Id.* at 41. The Commissioner notes the ALJ explained the reasoning for discounting the GAF scores, namely, that they were inconsistent with the objective medical evidence and the lack of consistent, ongoing treatment from a mental health professional. *Id.* The Commissioner also notes the ALJ's discussion of Plaintiff's lack of treatment appears to be based on the fact that her conditions were not as severe as alleged, as demonstrated by her daily activities, and not due to a lack of money or insurance. *Id.* at 41-42. The Commissioner asserts the ALJ properly discounted Plaintiff's credibility given her ability to continue working after the alleged onset date. *Id.* at 42. The Commissioner argues she has declined to endorse GAF scores for use in disability programs because they may simply represent "an examiner's impression of the patient's alleged symptoms on one day with little or no bearing on the patient's functioning, particularly her ability to work." *Id.* (citing DSM IV). The Court recommends substantial evidence supports the ALJ's decision to afford the diverse GAF scores minimal weight.

The record contains a large variety of GAF scores ranging from 1 to 55[10] between 2009 and 2012. *See* Tr. 492, 494, 498, 500, 509, 511, 513, 515, 517, 523,

---

[10] A GAF score between 1 and 10 indicates persistent danger of severely hurting one's self or others, persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death. DSM IV, 32. A score between 11 and 20 indicates some danger of hurting one's self or others, occasionally fails to maintain minimal personal hygiene or gross impairment in communication. *Id.* A score between 21 and 30 indicates behavior is considerably influenced by delusions or hallucinations, serious impairment in communication or judgment, or inability to function in almost all areas. *Id.* A score between 31 and 40 indicates some impairment in reality testing or communication or major

525, 529, 533, 647, 651, 674, 683, 693, 701.    During Plaintiff's August 2009 hospitalization following her attempted suicide alone, Plaintiff's GAF scores ranged from 1 on August 14, 2009 to 55 on August 20, 2009.   *See* Tr. 647, 701.    After her December 2009 hospitalization due to another suicide attempt, Plaintiff's GAF ranged from 40 on December 27, 2009 to 50 on December 31, 2009.    Tr. 492, 525. More than half of Plaintiff's GAF scores were assessed during or immediately following hospitalizations.    Tr. 492, 494, 525, 647, 651, 674, 683, 693, 701.

Although every medical opinion, including GAF scores, must be evaluated, medical source opinions may be discounted when the opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if the opinion is inconsistent with the record as a whole.    20 CFR §§ 404.1527(c), 416.927(c); SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159-60 (11th Cir. 2004).    Here, the ALJ considered and evaluated the GAF scores, and she clearly articulated reasons for discounting them.    Tr. 26.    First, the ALJ found the scores did not provide a function-by-function analysis of the claimant's abilities, which indicates the scores do not provide probative information regarding Plaintiff's ability to work.    *Id.*    Indeed, the Commissioner has not endorsed the use of GAF scores in assessing disability for Social Security purposes because the GAF scale "does not have a direct correlation to the severity requirements in [the] mental

---

impairment in several areas, such as work or school.    *Id.*    A score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning, and a score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational or school functioning.    *Id.*

disorder listings," and GAF scores were abandoned in the most recent version of the DSM.   *Thornton v. Comm'r, Soc. Sec. Admin.*, 597 F. App'x 604, 613 (11th Cir. 2015) (quoting Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)); American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 16 (5th ed. 2013) ("DSM V").   Moreover, the Eleventh Circuit has found that "GAF scores are not sufficiently pertinent to the ability of an individual to work to require an ALJ to list every GAF score that appears in the medical records.   The relevant inquiry is whether there is substantial evidence to support the Commissioner's finding." *Thornton*, 597 F. App'x at 613.

Second, the ALJ found these scores are not consistent with the record as a whole, including the overall objective medical evidence and the lack of consistent, ongoing treatment from a mental health professional.   Tr. 26.   Substantial evidence in the record supports this conclusion.   As discussed above, the objective medical evidence, Plaintiff's treatment history, Plaintiff's activities of daily living and the overall record are inconsistent with serious symptoms or serious impairments in social, occupational or school functioning.   As the ALJ noted in evaluating Plaintiff's mental impairments:

> [T]he record does show that the claimant attempted suicide; however, the record on multiple occasions indicates that the claimant's thought content was coherent; there was no suicidal ideation or homicidal ideation; her mood/affect was appropriate; she was oriented on all spheres; her speech was normal; her psychomotor behavior was normal; and she was cooperative.   Also notable, treatment records from more than one occasion indicate that the claimant was well groomed; her behavior was normal; there was no agitation; there were no delusions or

hallucination; there was no suicidal ideation or homicidal ideation; and her insight and judgment were fair and/or good. Moreover, records from several occasions indicate that the claimant's thought processes were goal-directed. Additionally, treatment notes from a multitude of occasions indicate the claimant's mood was euthymic and her affect was appropriate. The undersigned also notes that Patient Health Questionnaire (PHQ-9) from March 2015 had a total severity score of zero [indicating mild or minimal depressive symptoms]. Also notable, physical treatment records from more than one occasion indicate that the claimant's review of systems was negative for depression, anxiety, and agitation. The findings discussed herein, coupled with the lack of significant ongoing treatment from a mental health professional, d[o] not support a finding of a disabling mental disorder.

Tr. 21 (footnotes omitted) (citations omitted) (citing Tr. 491-92, 496-98, 503, 508, 510, 512, 514, 516, 518, 520, 522, 524, 527-29, 531-33, 540-42, 551, 598, 614, 617, 647, 655, 669). Further, although "a claimant's inability to afford a prescribed medical treatment excuses noncompliance," the ALJ's assessment of Plaintiff's mental impairments did not rely exclusively on Plaintiff's lack of significant ongoing treatment from a mental health professional, which is evident from the excerpt above. *See* Tr. 22; *Dawkins v. Bowen*, 848 F.2d 1211, 1212 (11th Cir.1988). Therefore, the Court recommends substantial evidence supports the ALJ's decision to give the various GAF scores no weight.

### d. *Step five determination*

At step five of the sequential evaluation process, the burden shifts to the Commissioner to produce evidence that there is other work available in significant numbers in the national economy that the claimant can perform given her RFC. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999); *Hale v. Brown*, 831 F.2d 1007, 1011 (11th Cir. 1987). If the Commissioner can produce evidence of jobs available in

significant numbers in the national economy that Plaintiff can perform, the burden shifts back to Plaintiff to prove she is unable to perform the jobs identified by the Commissioner.   *See Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001) (citing *Jones*, 190 F.3d at 1228).

Here, Plaintiff argues (1) the ALJ erred by finding the jobs the VE identified comply with Plaintiff's RFC; and (2) substantial evidence does not support that a significant number of jobs exist that Plaintiff can perform because the VE failed to exclude part-time jobs and jobs that exceed Plaintiff's RFC.   Doc. 23 at 20-21, 23-25. The Court recommends substantial evidence supports the ALJ's step five determination.

i.   The identified jobs' compliance with Plaintiff's RFC

The ALJ must consider the claimant's RFC, age, education and work experience to determine whether the claimant "can make an adjustment to other work."   20 C.F.R. §§ 404.1520(a)(4)(v), (g), 416.920(a)(4)(v), (g).   In making this determination, "the ALJ must articulate specific jobs that the claimant is able to perform, and this finding must be supported by substantial evidence."   *Wilson*, 284 F.3d at 1227.   The ALJ is permitted to consider the DOT, which is published by the Department of Labor.   SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000); *see* DOT, Occupational Definitions (4th ed., rev. 1991).   The ALJ also is authorized to consider the testimony of a VE as a source of occupational evidence.   SSR 00-4p, 2000 WL 1898704.   "[I]n order for a VE's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's

impairments." *Phillips*, 357 F.3d at 1240 n.7 (quoting *Jones*, 190 F.3d at 1229). The ALJ has an affirmative duty to "ask about any possible conflict between [the VE's testimony] and information provided in the DOT." SSR 00-4p, 2000 WL 1898704.

At the hearing, the VE testified there would be a representative number of jobs accommodating the hypothetical person the ALJ presented with Plaintiff's ultimate RFC determination—including a limitation to simple, routine and repetitive work— and identified the jobs of hand packager, mold filler, price marker and laundry classifier. Tr. 83-84. The ALJ relied on the VE's testimony to find there are jobs that exist in significant numbers in the national economy Plaintiff can perform based on her age, education, work experience and RFC, namely the four jobs identified by the VE. Tr. 28. The ALJ asked the VE whether her testimony was consistent with the DOT, and the VE answered in the affirmative. Tr. 95. The ALJ also asked the VE if there were any portions of her testimony that are not addressed in the DOT, and the VE explained that off-task behavior is not addressed in the DOT, but she based such opinions on her experience working with human resource representatives and companies, labor market surveys, job analyses and her communications with peers. Tr. 95-96.

Plaintiff argues her limitation to simple, routine and repetitive work equates to a reasoning level of 1 as defined by the DOT.[11] *See* Doc. 23 at 20. Thus, because

---

[11] The DOT defines reasoning level 1 as requiring the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job." DOT, Appendix C: Components of the Definition Trailer, § III, General Educational Development. Reasoning level 2 is defined as requiring the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with

the jobs of hand packager, mold filler, price marker and laundry classifier have a reasoning level of 2, Plaintiff asserts all four jobs exceed her RFC. *See id.* A limitation to perform simple, routine and repetitive work, however, is not inconsistent with a reasoning level of up to 3 for unskilled work, and all four identified jobs are unskilled jobs with a specific vocational profile ("SVP") of 1 or 2.[12] *See, e.g.,* *Chambers v. Comm'r of Soc. Sec.*, 662 F. App'x 869, 873 (11th Cir. 2016) (finding a job with a reasoning level of 3 was consistent with unskilled, "simple work" limitations because the position also had an SVP of 2); *Hobbs v. Colvin*, No. 8:13-cv-3233-T-24MAP, 2015 WL 628763, at *5 (M.D. Fla. Feb. 12, 2015) (collecting cases finding "the requirement of Reasoning Level 2 or 3 is not inconsistent with the ability to perform only simple tasks").

Plaintiff also argues all four of the jobs identified by the VE exceed her RFC because they require an ability to work "according to set procedures, sequence, or pace" despite the ALJ prohibiting work with production rate or pace work.   Doc. 23 at 21.   In referencing particular "temperament" codes—namely, temperaments "R" and "T"[13]—Plaintiff cites to exhibits not included with the Joint Memorandum.   *See*

---

problems involving a few concrete variables in or from standardized situations."   *Id.*

[12] The DOT defines SVP as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."   DOT, Appendix C: Components of the Definition Trailer, § II, SVP.   An SVP of 1 encompasses a short demonstration only, and an SVP of 2 encompasses "[a]nything beyond a short demonstration up to and including 1 month."   *Id.*

[13] Plaintiff defines temperament "R" as "[p]erforming repetitive work, or performing continuously the same work, according to set procedures, sequence, or pace."   Doc. 23 at 21. She defines temperament "T" as "situations requiring the precise attainment of set limits, tolerances or standards."   *Id.*   Plaintiff indicates all four jobs identified by the VE require the temperament "R," and the job of price marker additionally requires the temperament "T."

- 36 -

*id.* Plaintiff's source for these temperament codes is therefore unclear, but the Court notes the DOT titles for each of the four jobs contain no references to temperament codes or a production rate/pace work requirement. *See* Tr. 95; DOT, 920.587-018, 1991 WL 687916; DOT, 556.687-030, 1991 WL 683505; DOT, 209.587-034, 1991 WL 671802; DOT, 361.687-014, 1991 WL 672991.

Moreover, because the VE testified that her opinions were consistent with the DOT and the ALJ found the VE "sufficiently qualified as an expert to offer testimony during the hearing based off of her exemplary education, training and experience that's set forth in her resume," the ALJ was permitted to rely on the VE's testimony. *See* Tr. 41, 95; *Bryant v. Comm'r of Soc. Sec.*, 451 F. App'x 838, 839 (11th Cir. 2012) ("The Social Security regulations provide that an ALJ may rely on a VE's knowledge and expertise, and they do not require a VE produce detailed reports or statistics in support of her testimony."); *Curcio v. Comm'r of Soc. Sec.*, 386 F. App'x 924, 926 (11th Cir. 2010) ("[T]he Social Security regulations clearly allow that the Commissioner may rely on a VE for her knowledge or expertise." (citing 20 C.F.R. §§ 404.1560(b)(2), 404.1566(e), 416.960(b)(2), 416.966(e))); *see also* Tr. 440-42.   Further, Plaintiff's counsel did not "raise the issue of any potential conflict between the VE's testimony and the DOT" regarding reasoning levels or temperament codes during the hearing. *See* Tr. 76-105; *Hobbs*, 2015 WL 628763, at *5.   Therefore, the Court recommends substantial evidence supports the ALJ's finding that Plaintiff could perform the jobs of hand packager, mold filler, price marker and laundry classifier.

---

*Id.*

ii.   Job numbers

Work exists in the national economy if it exists in significant numbers either in the region where Plaintiff lives or in several regions of the country, regardless of whether work exists in Plaintiff's immediate geographical area, whether specific job vacancies exist, or whether Plaintiff would be hired if she applied.   *See Atha v. Comm'r, Soc. Sec. Admin.*, 616 F. App'x 931, 933-35 (11th Cir. 2015) (citing 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.966(a)-(c)).   As to what constitutes a "significant number" in this context, the Eleventh Circuit has not fashioned a bright line rule. As the court recently noted:

> This Court has never held that a minimum numerical count of jobs must be identified in order to constitute work that "exists in significant numbers" under the statute and regulations. We have concluded, however, that the "appropriate focus under the regulation is the national economy," not the local economy in which the claimant lives.

*Id.* at 934 (quoting *Allen v. Bowen*, 816 F.2d 600, 603 (11th Cir. 1987)).

Here, Plaintiff argues some jobs within the OES groups for each of the four DOT titles identified by the VE are part-time and/or exceed Plaintiff's RFC, and elimination of such inapplicable positions would leave a less-than-significant number of jobs Plaintiff can perform.   Doc. 23 at 23-24.   Plaintiff cites to the VE's testimony indicating she used *OccuBrowse* and *Job Browser Pro* to add and delete sectors she found appropriate and weigh the numbers to determine the job numbers for a specific DOT code.   *Id.* at 25.   Plaintiff suggests that some of the identified jobs belong in sectors that include jobs precluded by Plaintiff's RFC, and there is no indication the VE excluded all industries and job functions precluded by Plaintiff's RFC.   *Id.*   The

Commissioner argues the VE testified regarding the job numbers for the DOT-title-specific jobs she had identified.   *Id.* The Commissioner asserts the numbers identified represent a significant number of jobs in the national economy.   *Id.* The Commissioner asserts the VE explained how she determined the job numbers, and the ALJ found the VE's testimony to be persuasive and well-supported.   *Id.* at 25-26. Thus, the Commissioner contends the ALJ properly relied on the VE's testimony to make her step five determination.   *Id.* at 26.

The Court recommends substantial evidence supports the ALJ's finding that there are jobs in significant numbers in the national economy that Plaintiff can perform.   The ALJ's finding that work exists in significant numbers in the national economy that Plaintiff can perform was based on the VE's testimony that in the United States, there are about 40,000 hand packager jobs, about 40,000 mold filler jobs, about 30,000 price marker jobs and about 90,000 laundry classifier jobs.   *See* Tr. 28, 84.   During Plaintiff's counsel's cross-examination, the VE thoroughly explained how she determined the job numbers for the four positions:

> Q:     . . . . And, Ms. LaFlamme, the job numbers you provided, did you rely on the information in the *Job Browser* and *SkillTRAN* software?
>
> A:     Yes, and the *Bureau of Labor Statistics.*
>
> Q:     Okay.   So, well, as far as the *Bureau of Labor Statistics*, did you get the job numbers from the *Bureau of Labor Statistics* through the software or separate or –
>
> A:     No.   No, separately.
>
> Q:     Okay.   So, as far as estimating job numbers for the specific *DOT*

> titles that you provided, where do you get those numbers or how do you estimate them?
>
> A:   With *OccuBrowse* I have to extrapolate from the *SOC* codes and with *Job Browser Pro* I have to default to certain industrial sectors.   And the what I do is I add and delete the sectors that I find appropriate, then the numbers are weighted and I come up with numbers that way.   So that it's a specific *DOT* code as opposed to the *OES* code.
>
> Q:   So you're saying that the individual sectors in *Job Browser* are the specific – basically divisioned by the *DOT* code? So they –
>
> A:   They are *DOT*-specific, yes.

Tr. 92-93 (emphasis in original).   Nothing from the VE's testimony suggests she relied on numbers for the OES groups, which include part-time jobs or jobs outside of Plaintiff's RFC; rather, the VE specifically indicated she was determining job numbers based on the positions' individual DOT titles, and Plaintiff's RFC was fully articulated in the ALJ's hypothetical to the VE.   *See* Tr. 82-85, 93.   Further, as discussed above, the ALJ was permitted to rely on the VE's testimony.   *See Bryant*, 451 F. App'x at 839; *Curcio*, 386 F. App'x at 926.   Therefore, the Court recommends substantial evidence supports the ALJ's step five determination.

ACCORDINGLY, it is respectfully

**RECOMMENDED:**

1.   The decision of the Commissioner be **AFFIRMED.**

2.   The Clerk of Court be directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(b) in favor of the Commissioner, and close the file.

**DONE** and **ENTERED** in Fort Myers, Florida on this 28th day of July, 2018.

CAROL MIRANDO
United States Magistrate Judge

Copies:
Counsel of record